UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
DAVID TORRES,

                 Plaintiff,

       -against-

COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.
-----------------------------------------------------------X

**ORDER**
13-CV-0914 (SJF)

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   AUG 1 2 2014   ★

**LONG ISLAND OFFICE**

FEUERSTEIN, J.

      David Torres ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final determination of defendant Commissioner of Social Security ("Commissioner") that plaintiff is not eligible to receive Supplemental Social Security Income ("SSI") under the Social Security Act (the "Act"). Now before the Court is the Commissioner's unopposed motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the Commissioner's motion is granted.

I.     Background

      A.     Administrative Proceedings

      Plaintiff is a thirty-eight (38) year old male. (Transcript of Administrative Record ("Tr.") [Docket Entry No. 17], 140). On March 7, 2011, plaintiff filed an application for SSI benefits, alleging that he was disabled due to injuries from gunshot wounds to his spine and left foot, injuries of his neck and shoulder, and a laceration of his left hand. (Tr. 7, 53, 156). On June 9, 2011, the Social Security Administration ("SSA") denied plaintiff's application and determined that plaintiff was not disabled, and explained that "based on [plaintiff's] age of 35 years, [his] education of 12 years, and [his] experience, [he] can perform light work" and his "condition is

1

not severe enough to keep [him] from working." (Tr. 54-57). On June 29, 2011, plaintiff filed a written request for a hearing. (Tr. 7, 159).

On March 20, 2012, a hearing was held before Administrate Law Judge ("ALJ") Brian J. Crawley, at which plaintiff appeared with his attorney. (Tr. 18-41). On May 31, 2012, ALJ Crawley issued a decision (the "ALJ Decision") denying plaintiff's application for SSI benefits and concluding that plaintiff was not disabled. (Tr. 4-13). On July 31, 2012, plaintiff sought review of the ALJ Decision by the Appeals Council of the SSA Office of Disability Adjudication and Review. (Tr. 42). On December 20, 2012, the Appeals Council denied plaintiff's request for review, rendering the ALJ Decision the final decision of the Commissioner. (Tr. 1-3).

On February 19, 2013, plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's final determination. [Docket Entry No. 1]. On June 12, 2013, the Commissioner filed an answer and served plaintiff with the administrative record. [Docket Entry No. 11]. On November 14, 2013, the Commissioner moved for judgment on the pleadings. [Docket Entry No. 15]. Plaintiff has not opposed the Commissioner's motion.

B.    Medical Records

1.    Plaintiff's Treatment Records

In 2000, plaintiff sustained a gunshot wound to his back. (Tr. 176). On March 24, 2005, x-rays of plaintiff's right hip showed no abnormalities. (Tr. 189). On March 30, 2005, a computerized tomography ("CT") scan of plaintiff's pelvis revealed a bullet fragment at the level of the right ileum. (Tr. 186). On April 14, 2005, an x-ray of plaintiff's right shoulder showed no fracture or dislocation. (Tr. 188). On May 10, 2005, an x-ray of plaintiff's right hip showed a bullet within the right ilium, but no bone, joint, or soft tissue abnormality. (Tr. 187). On June

18, 2005, plaintiff underwent a whole-body bone scan, which revealed normal bone activity, except for abnormal uptake in the right maxilla that was likely dental in origin. (Tr. 185).

On June 16, 2006, Dr. Fawzy Salama from Queens-Long Island Medical Group ("QLIMG") conducted a neurological evaluation of plaintiff, which revealed that: plaintiff's cranial nerves were within normal limits; all muscle groups of plaintiff's upper and lower extremities were of normal strength; his deep tendon reflexes were 1+ symmetrical and equal; and moderate restrictions of plaintiff's lumbar spine mobility. (Tr. 179). Plaintiff was able to heel-walk and tip toe. (*Id.*). There was positive straight leg raising sign on the right side up to eighty (80) degrees. (*Id.*). The impression was listed as chronic lower back pain, and right hip pain, possibly related to the bullet injury. (*Id.*).

On August 10, 2006, Dr. Donna Mohamed of QLIMG diagnosed plaintiff with low back pain. (Tr. 178).

On October 24, 2006, Dr. A. Pluchinotta of QLIMG conducted an orthopedic evaluation of plaintiff, during which plaintiff was able to ambulate on his heels and toes without difficulty. (Tr. 176). Dr. Pluchinotta found plaintiff's spine and hips had some limitation in range of motion, there was some discomfort throughout the right groin area, and the straight leg raising test was negative bilaterally. (Tr. 176-77). Dr. Pluchinotta's diagnosis was "retained bullet, right iliac bone status post gunshot wound," and instructed plaintiff "to follow up with pain management specialist for treatment of chronic pain." (Tr. 177).

On July 18, 2007, Dr. Mohamed found plaintiff's motor strength, heel walking, musculoskeletal system, and lumbosacral spine motion were normal. (Tr. 250). Plaintiff's lumbosacral spine exhibited no tenderness on palpation. (*Id.*). Dr. Mohamed's assessment was "pain localized to one or more joints," "lumbago," and "sciatica." (*Id.*). X-rays of plaintiff's

3

lumbar spine taken that day were negative, and x-rays of plaintiff's hips revealed mild osteoarthritis. (Tr. 184).

On October 19, 2007, Dr. Pluchinotta saw plaintiff for an "orthopedic followup," during which plaintiff stated that "he has not returned to work due to his chronic pain" and "has not seen [a] pain management specialist." (Tr. 174). Dr. Pluchinotta noted that plaintiff's gait was physiologic, examination of the spine revealed mild discomfort with full flexion, but no tenderness to palpitation of the spine or paraspinous muscles, straight leg raising test produced only lower back pain, peripheral pulses were intact, and the neurological examination was unremarkable. (Id.). Dr. Pluchinotta's impression was that the origin of plaintiff's symptoms appeared to be obscured. (Id.).[1]

On September 5, 2008, following a gunshot wound to his left foot, plaintiff was admitted to Nassau University Medical Center for treatment. (Tr. 337). X-rays on plaintiff's left foot revealed a fracture of the navicular bone. (Tr. 352). X-rays of plaintiff's lumbosacral spine revealed no acute fracture or dislocation. (Tr. 353). Upon his discharge on September 9, 2008, plaintiff had no physical activity limitations and could ambulate with crutches. (Tr. 337).

On September 15, 2008, Dr. Mark Panish of QLIMG treated plaintiff following the gunshot wound to his left foot. (Tr. 232). Plaintiff had been receiving percocet in the hospital, but complained that Tylenol and advil were not helping his pain. (Id.). Dr. Panish prescribed plaintiff acetaminophen-codeine and wrote "surgery ASAP" under "Plan." (Id.). On September 18, 2008, plaintiff went to QLIMG for a surgery consultation, where his wound was cleaned and he was advised to remain non-weight bearing until seen by an orthopedist. (Tr. 220-21).

---

[1]     On July 25, 2007, August 10, 2007, and November 26, 2007, QLIMC sent plaintiff a letter because plaintiff failed to show up for his scheduled appointments. (Tr. 233, 235, 236).

On September 23, 2008, Dr. Christopher Durant of QLIMG examined plaintiff, who complained of pain in his left foot and difficulties ambulating and bearing weight. (Tr. 215). Dr. Durant's impressions were a gunshot wound and navicular bone fracture of the left foot. (*Id.*). Plaintiff was prescribed a CAM walker after he declined the cast treatment initially recommended by Dr. Durant. (Tr. 216). X-rays revealed a comminuted fracture of the tarsonavicular bone in the left foot. (Tr. 209).

On September 30, 2008, Dr. Durant conducted a follow-up orthopedic evaluation of plaintiff, and found there was still some swelling and tenderness in the left foot, and recommended that plaintiff continue to use the CAM walker and obtain new x-rays of the left foot in three (3) to four (4) weeks. (Tr. 208).

On October 21, 2008, plaintiff went to QLIMG for an orthopedic follow-up. (Tr. 206). X-rays taken of plaintiff's left foot showed "possible early healing." (Tr. 207). Plaintiff was advised to continue to use the CAM walker, report for a follow up visit and x-rays in four (4) weeks, and was referred for physical therapy for ankle range of motion exercises. (Tr. 206).[2]

On January 8, 2009, plaintiff was seen by Dr. Panish at QLIMG. (Tr. 203). Dr. Panish noted that plaintiff needed forms for social services filled out, and that plaintiff had continued back pain, he could sit for just less than one (1) hour, he could not stand for an hour, he could not lift ten (10) pounds, and that he was limping. (*Id.*). Dr. Panish listed the assessment as low back pain and open fracture of the navicular bone of the left foot. (*Id.*).

On January 13, 2009, physician assistant Eugene Butta of QLIMG saw plaintiff for a follow up visit, and found that plaintiff's gunshot wounds were well healed and range of motion was satisfactory on plantar flexion and dorsiflexion of the left foot. (Tr. 198). X-rays of the left

---

[2]     The Administrative Record is devoid of medical records for any appointments between October 21, 2008 and January 8, 2009.

foot taken that same day revealed callus formation and malunion due to comminuted fracture, and a deformity of the tarsonavicular bone consistent with chronic fracture. (Tr. 199).

On January 27, 2009, Eugene Butta saw plaintiff for another follow up visit, found that plaintiff's left foot showed slight swelling and a slightly depressed arch, and referred plaintiff for arch support. (Tr. 194). X-rays of plaintiff's left foot taken that same day revealed healing of the comminuted fracture of the navicular bone. (Tr. 195).

On July 29, 2009, Dr. Panish treated plaintiff, who complained of pain in his left foot and lower back, inability to bend or sleep, swelling of his left foot medially, and numbness of his left first toe. (Tr. 192). Dr. Panish noted that plaintiff was limping, and listed the assessment as lower back pain, tendonitis, and lumbago. (Id.).

On August 21, 2009, Dr. Peter Tse of QLIMG examined plaintiff, who complained of pain and numbness of his left foot. (Tr. 191). Dr. Tse found that plaintiff's motor strength, reflexes, gait and stance were normal, and observed a decreased pin over dorsum of plaintiff's left foot. (Id.). Dr. Tse listed the assessment as lower back pain and gunshot wound of the foot. (Id.). X-rays of plaintiff's lumbar spine taken that same day were "[e]ssentially unremarkable," with no fracture or dislocation, disc spaces were preserved, pedicles and sacroiliac joints were normal, and a bullet was seen overlying the right pelvic bone. (Tr. 190). X-rays taken that same day of plaintiff's left foot were negative, with no fracture, dislocation, or other abnormality. (Tr. 251).

On September 25, 2009, Dr. Tse found decreased pin dorsum of plaintiff's left foot, and the remaining neurological findings were normal. (Tr. 409). Dr. Tse listed the assessment as closed fracture of the tarsometatarsal joint and lumbago. (Id.).

On October 26, 2009, Dr. Ali Moazen of QLIMG treated plaintiff, who complained of throbbing pain in his left foot, and noted "[p]atient has decrease sharp/dull and vib decrease on 1-3 toes." (Tr. 407-08).

On October 28, 2009, Dr. Panish completed a "Nassau County Department of Social Services: Medical Report for Determination of Disability/Employability," in which he diagnosed plaintiff with "lumbago, back pain, bullet in back, foot pain, fracture [of] left navicular back [secondary to] gunshot"; noted that plaintiff was prevented from working by "sitting, standing limited due to bullet in back and fractured left navicular"; and concluded that plaintiff was employable part time with restrictions, in that he could perform sedentary work but needs to get up every hour, and that plaintiff could lift ten (10) pounds occasionally, sit for six (6) hours per day, stand for two (2) hours per day, and walk for two (2) hours per day. (Tr. 424).

On December 27, 2009, plaintiff went to the emergency room at Mercy Medical Center for a laceration of his left thumb, where he was given sutures and discharged later the same day. (Tr. 372-84).

On January 4, 2010, plaintiff was seen by Dr. Clara Rivera of QLIMG for a surgery consultation for the six (6) centimeter laceration on his left hand that he sustained trying to break up a fight. (Tr. 401-02). Dr. Rivera noted, with respect to plaintiff's left hand, that he was able to flex his thumb, his ligaments were intact, and his sensory status was normal on the radial half, but decreased on the lunar half. (Tr. 402). The rest of plaintiff's left hand had full motion, no pain, and no other injury, and his left wrist had no pain or edema. (*Id.*). On January 7, 2010, the sutures in plaintiff's left hand were removed at Mercy Medical Center. (Tr. 385-91).

On April 29, 2010, plaintiff sought treatment for mild knee pain at the Nassau University Medical Center following a motor vehicle accident. (Tr. 345-46). X-rays of plaintiff's cervical spine, lumbosacral spine, and left knee showed no acute fractures or dislocation. (Tr. 347-49).

On December 11, 2010, plaintiff sought treatment for chest pain at the South Nassau Communities Hospital following a motor vehicle accident. (Tr. 330-35). Chest x-rays showed plaintiff's lungs were clear and the bony structures were unremarkable. (Tr. 334). A CT scan of plaintiff's cervical spine revealed reversal of the normal cervical lordosis, no acute fractures, and straightening produced by voluntary positioning or muscle spasm. (Tr. 335). Plaintiff was diagnosed with a chest wall contusion and neck sprain. (Tr. 331).

On March 29, 2011, plaintiff was treated at Nassau University Medical Center for a toothache. (Tr. 416-23).

On August 18, 2011, plaintiff was treated at Mercy Medical Center for low back pain caused by lifting a heavy object. (Tr. 392-401). X-rays of plaintiff's lumbar spine showed normal curve and no fracture, mild osteoarthritic changes in the lumbar spine with the disc space narrowing at L5-S1, and a metallic fragment in the lower quadrant. (Tr. 397). Upon discharge, plaintiff was able to stand and walk. (Tr. 394).

2.    SSA's Medical Consultant

On June 1, 2011, Dr. Linell Skeene performed an orthopedic consultation of plaintiff upon referral from the Division of Disability Determination. (Tr. 365-68). Upon physical examination, plaintiff had a normal gait; was unable to walk on his heels or toes; was able to squat fully; had normal station; used a cane (only when outdoors and not during the examination), which was not medically necessary; needed no help changing for the exam or getting on or off the exam table; and was able to rise from a chair without difficulty. (Tr. 366-

68). Dr. Skeene noted that plaintiff's hand and finger dexterity was intact and he had grip strength of 5/5, bilaterally. (Tr. 366). Upon examination of plaintiff's cervical spine, there was full flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally; no cervical or paracervical pain or spasm; and no trigger points. (*Id.*). Upon examination of plaintiff's upper extremities, there was a full range of motion of shoulders, elbows, forearms, wrists and fingers bilaterally; no joint inflammation, effusion, or instability; strength was 5/5 in proximal and distal muscles; there was no muscle atrophy; no sensory abnormality; reflexes were physiologic and normal; and there was a well-healed four (4) inch scare over the thenar eminence of the left hand. (*Id.*). Upon examination of the thoracic and lumbar spine, there was limited range of motion of the lumbar spine, with flexion and extension to forty-five (45) degrees, lateral flexion bilaterally at ten (10) degrees, and lateral rotation bilaterally at twenty (20) degrees; no tenderness over the lumbar spine; no sacroilian or sciatic notch tenderness; no scoliosis or kyphosis; no trigger points; and straight leg testing was negative bilaterally. (Tr. 367). Upon examination of plaintiff's lower extremities, there was full range of motion of the hips, knees, and right ankle; there was limited range of motion in the left ankle, with dorsiflexion to ten (10) degrees, and plantar flexion at thirty (30) degrees; strength was 5/5 in proximal and distal muscles; there was no muscle atrophy or sensory abnormality; there was no joint effusion, inflammation, or instability; and reflexes were physiologic and equal. (*Id.*). Dr. Skeene diagnosed plaintiff as "status post gunshot wound to the back," "status post gunshot wound to the left foot with mild foot drop," and "stab wound of the left thumb," and listed his prognosis as "fair." (*Id.*). Dr. Skeene opined that plaintiff had "moderate limitation for walking and heavy lifting, due to limited [range of motion] of the lumbar spine." (*Id.*).

3.    SSA's RFC Assessment

On June 8, 2011, G. Davidson, a disability analyst, evaluated evidence in plaintiff's file in order to determine his residual functional capacity ("RFC"), including: (i) January 13, 2009 x-rays of plaintiff's foot that showed deformity of the tarsonavicular bone consistent with chronic fracture; (ii) August 21, 2009 x-rays of plaintiff's foot that showed no fracture, abnormality or dislocation; (iii) August 21, 2009 x-rays of plaintiff's lumbar spine that showed no fracture or dislocation, normal pedicles and sacroiliac joints, preserved disc spaces, and a bullet overlying the right pelvic bone; and (iv) the June 1, 2011 orthopedic examination by Dr. Skeene. (Tr. 354-59). Although Davidson noted that plaintiff complained of pain, "a symptom attributable to medically determinable impairments based upon the medical evidence" considered, Davidson did not make a credibility assessment because plaintiff did not describe any following functional limitations arising from his symptoms. (Tr. 358). Upon review of those facts, Davidson opined that plaintiff could occasionally lift and/or carry twenty (20) pounds; could frequently lift and/or carry ten (10) pounds; could stand and/or walk for about six (6) hours in an eight (8) hour workday; could sit with normal breaks for about six (6) hours in an eight (8) hour workday; had no limitation in his ability to push and pull, including the operation of hand or foot controls; had no postural limitations, including climbing, balancing, stooping, kneeling, crouching, and crawling; had no manipulative limitations, including reaching in all directions, handling, fingering, and feeling; and had no visual, communicative, or environmental limitations. (Tr. 355-58).

C.     Non-Medical Records

        1.     Work Activity Report

A work activity report (Form SSA-821), completed on plaintiff's behalf by an SSA representative on October 24, 2007, indicates that on December 30, 2003, plaintiff began a construction job, working eight (8) hours per day at fifteen dollars ($15.00) per hour, and stopped working on November 20, 2004 because of his medical condition. (Tr. 130-39).

        2.     Disability Report

A disability report (Form SSA-3367), completed on behalf of plaintiff by the Social Security Field Office on March 28, 2011, identifies plaintiff's alleged onset date as January 1, 2005 and the date that plaintiff was last insured for disability benefits as September 30, 2005. (Tr. 140-44).

An undated adult disability report (Form SSA-3368) identifies plaintiff's alleged impairments as "spinal problems due to shooting accident, left foot," "left foot injuries due to shooting," "left hand laceration," and "shoulder and neck injury"; notes that plaintiff obtained a GED in 1995; indicates that plaintiff worked as: (i) a machinist from 1994 to 1995, and 1999 to June 2001, at ten dollars ($10.00) per hour, (ii) a carpenter in 1996 for three hundred dollars ($300.00) per week, and (iii) a construction worker from December 2003 to November 2004 for fifteen dollars ($15.00) per hour. (Tr. 145-52).

An undated appeal disability report (Form SSA-3341) indicates that since the filing of plaintiff's last disability report on March 28, 2011, plaintiff's conditions worsened on May 20, 2011, he has "more pain in lower back, hip, and foot," his "limits on standing, walking, and sitting are worse," he has "slower movements and need[s] help sometimes," and has "less ability to move." (Tr. 162-167).

11

D.    Plaintiff's Hearing Testimony

On March 20, 2012, a hearing was held before ALJ Crawley, at which plaintiff gave the following testimony, (Tr. 18-41):

Plaintiff lives with his mother and his ten (10) year old son in Hempstead, New York. (Tr. 23). Plaintiff "only made it up to tenth grade" but he has a GED, and is not currently a student. (Tr. 23, 33). Plaintiff has not worked since January 1, 2005, the alleged disability date, and has not looked for any type of work. (Tr. 24). Plaintiff tried to work back in 2004, but "it just didn't work." (Tr. 40).

Plaintiff was shot in the back when he came out of a bar and "somebody was just firing at another person and turned the gun on [him]." (Tr. 24). As a result of being shot in the back, plaintiff experiences low back pain which radiates down his left leg, a warm sensation on the back of his legs and thighs, weakness, and "hard breathing." (Tr. 25). Plaintiff was also shot in the left foot, which caused nerve damage and pain. (Tr. 24, 26). Plaintiff can only stand for forty-five (45) minutes to an hour, and can sit about thirty (30) minutes or two (2) hours, and can only walk for "ten (10) or fifteen (15) minutes without any type of pain." (Tr. 26). Dr. Mohamed prescribed plaintiff with a cane, which plaintiff brought to the hearing. (Tr. 27).

Plaintiff was on public assistance and received help from his mother. (*Id.*). Plaintiff tries to stay off his feet, watches television, reads, plays video games (but not on a frequent basis), and tries to go to the park with his son sometimes to get fresh air. (Tr. 28-30). Plaintiff drives about once a week, but not for very long, and just goes "from maybe here to the supermarket." (Tr. 29). Plaintiff's mother drives him to his medical appointments. (*Id.*). Plaintiff does not do much housework; his mother does laundry, food shopping, and helps plaintiff with his son. (Tr. 30-31). Plaintiff goes to the supermarket with his mom maybe twice a week, but could not carry

a five (5) pound bag of potatoes. (Tr. 31). Plaintiff needs help tying his sneakers, and wiping himself after using the bathroom is becoming difficult. (Tr. 37). Plaintiff does not need help bathing. (*Id.*).

Plaintiff takes ibuprofen, but does not "like the [prescription] pills" because it makes him nauseous, drowsy, and dizzy. (Tr. 31-32, 34). When his pain gets bad, plaintiff has "to go to the emergency room, but if it's not that bad [he] take[s] the over-the-counter ibuprofen, and whatever is prescribed to me." (Tr. 32). Plaintiff takes the prescription medication for pain approximately once a week. (Tr. 35-36). Plaintiff's preferred method of treatment is epidural injection when "the pain is excruciating." (Tr. 32). The epidural injections give plaintiff relief until he performs another hard task or sustains a sudden back injury. (Tr. 35). The last time that plaintiff went to the emergency room was in August 2011, two (2) days after he picked up a box that weighed "maybe 10 pounds" and his "back just went out," and he received an epidural injection. (Tr. 32-34). Plaintiff also lays down in the bedroom to relieve his symptoms. (Tr. 36). Plaintiff received physical therapy following a car accident at the end of last year, which "was helping [him] a whole lot but, unfortunately, the insurance company can't pay but so much," "so that was the only physical therapy that [he] was able to get." (Tr. 36-37).

Plaintiff sustained a laceration to his left hand when he grabbed the wrong end of a knife while stopping a fight between two (2) friends. (Tr. 33). Plaintiff receives treatment at QLIMC and Dr. Panish took on his case. (Tr. 37-38). Plaintiff cannot do a job where he would be mostly sitting because he is "in terrible pain" and "every five minutes [he] would have to like take a break." (Tr. 38).

II.   Discussion

    A.   Standards of Review

        1.   Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to a Rule 12(c) motion is the same as that applied to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). To survive such a motion, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Id.* at 679; *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The court is limited "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

Even where, as here, a motion for judgment on the pleadings is unopposed, "[w]here . . . the pleadings are themselves sufficient to withstand dismissal, a failure to respond to a 12(c) motion cannot constitute 'default' justifying dismissal of the complaint." *McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir. 2000) (internal quotation marks and citation omitted). The Second Circuit has also held, in the context of an unopposed motion for summary judgment, that courts must review the record and determine whether the moving party has established its entitlement to judgment as a matter of law. *See Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241,

246 (2d Cir. 2004). Accordingly, the Court has thoroughly reviewed the record and tested the sufficiency of plaintiff's claim in considering the Commissioner's unopposed motion for judgment on the pleadings.

2. Review of Determinations by the Commissioner of Social Security

Upon review of the final decision of the Commissioner, a court may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court must consider whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and citation omitted). "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks and citation omitted).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's conclusions of law or application of legal standards. *See Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Rather, courts have a statutory and constitutional duty to ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence. *See Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004). If a court finds that the

15

Commissioner has failed to apply the correct legal standards, the court must determine if the "error of law *might* have affected the disposition of the case." *Id.* at 189 (emphasis added). If so, the Commissioner's decision must be reversed. *Id.*; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the application of the correct legal standard could lead only to the same conclusion, the error is considered harmless and remand is unnecessary. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

B.     Eligibility Standard for SSI Disability Benefits

"To be eligible for SSI benefits, an applicant must show that 'by reason of any medically determinable physical or mental impairment' resulting from 'anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques, she is 'not only unable to do [her] previous work' but also prevented from 'engag[ing] in any other kind of substantial gainful work which exists in the national economy.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting 42 U.S.C. § 1382c(a)(3)).

Pursuant to regulations promulgated under the Act, the Commissioner is required to apply a five (5) step sequential analysis to determine whether an individual is disabled under Title II of the Act. 20 C.F.R. § 404.1520; *see also Talavera*, 697 F.3d at 151. The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i) and (b). "Substantial work activity" "involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity" "is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). If a claimant is doing "substantial gainful activity,"

the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Act] and meets the duration requirement." 20 C.F.R. § 416.1520(a)(4)(iii). If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d).

If the claimant is not found to be disabled at the third step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [("RFC")] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause

physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). The RFC is "the most [the claimant] can still do despite [his or her] limitations." *Id.*

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(1)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(1)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(1)(v). If the claimant can make an adjustment to other work, the claimant is not disabled. *Id.* If the claimant cannot make an adjustment to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(1)(v). While the claimant bears the burden of proving first four (4) steps of the sequential analysis, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's RFC] and vocational factors." 20 C.F.R. § 404.1560(c)(2); *see Talavera*, 697 F.3d at 151.

    C.      Review of the ALJ Decision

           1.   Whether the ALJ Applied the Correct Legal Standards

The ALJ followed the Act regulations by conducting the sequential evaluation and issuing a lengthy opinion, supporting each conclusion with detailed factual findings. (Tr. 11-17). In the May 31, 2012 ALJ Decision, the ALJ used the five (5) step sequential analysis and found, *inter alia*, that: (1) plaintiff "has not engaged in substantial activity since March 7, 2011, the

application date"; (2) plaintiff's "gunshot wound to the low back and right foot" were "severe impairments" that "caused more than minimal limitation in the claimant's ability to perform basic work activities"; (3) "[t]he record does not establish that the severity of the claimant's impairments rise to listing levels" of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1; (4) plaintiff "has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 416.967(a)"; (5) plaintiff "is unable to perform any past relevant work" as a machinist; and (6) "[c]onsidering [plaintiff's] age, education, work experience, and residual functional capacity, there are [sedentary] jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 13-17). Therefore, under step five (5) of the sequential analysis, the ALJ found that plaintiff was not disabled because a successful adjustment to other work can be made. (Tr. 17). Accordingly, the ALJ applied the correct legal standards in determining that plaintiff was not disabled within the meaning of the Act.

### 2. Whether the ALJ's Decision is Supported by Substantial Evidence

Having determined that the ALJ applied the proper legal principles in evaluating plaintiff's eligibility for SSI disability benefits, the second part of the inquiry is whether the decision is supported by substantial evidence. Plaintiff does not make any specific challenges to the finding that he has the RFC to perform the full range of sedentary work.[3] In determining that plaintiff has the RFC to perform sedentary work, the ALJ considered plaintiff's hearing testimony, plaintiff's medical records, as well as the medical opinions of Dr. Panish, plaintiff's

---

[3]    Given that plaintiff has not opposed defendant's motion for judgment on the pleadings, plaintiff's sole challenge to the ALJ decision appears in his complaint, submitted on a form provided by the Eastern District of New York, which alleges that "[t]he decision of the administrative law judge was erroneous, not supported by substantial evidence on the record and/or contrary to the law." Compl. ¶ 9.

treating physician, and Dr. Skeene, an independent physician.[4] (Tr. 13-16). The ALJ also considered plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms on his ability to work, but concluded these statements were not credible to the extent they are inconsistent with the RFC assessment. (Tr. 10).

The ALJ's decision is supported by plaintiff's own testimony, in which he admitted that he is able to shower and dress himself, drive once a week, go to the park with his son, and that epidural injections and physical therapy helped to alleviate his symptoms in the past. (Tr. 28-37). Furthermore, Dr. Panish, plaintiff's treating physician, concluded that plaintiff is employable full time with restrictions, in that he could he could perform sedentary work but needs to get up every hour, and that plaintiff could lift ten (10) pounds occasionally, sit for six (6) hours per day, stand for two (2) hours per day, and walk for two (2) hours per day. (Tr. 424). Similarly, Dr. Skeene's opinion that plaintiff had "moderate limitation for walking and heavy lifting," provides additional support for the ALJ's finding that plaintiff has the RFC to perform sedentary work. (Tr. 367). Even though the ALJ did not consider the disability examiner's physical assessment, the Court concludes that this RFC assessment provides further support for the ALJ's determination.

Accordingly, there was substantial evidence to support the ALJ's conclusion that plaintiff was not disabled as of March 7, 2011, and plaintiff was at least capable for performing sedentary work in the economy after that date.

---

[4]     The ALJ did not consider the disability examiner's physical assessment because it is not an acceptable medical source as defined under 20 C.F.R. §§ 404.1513(a) and 416.913(a). (Tr. 12).

III.    Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted. The Commissioner's decision denying plaintiff SSI disability benefits is affirmed. The Clerk of the Court shall close this case.

**SO ORDERED**.

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated: August 12, 2014
       Central Islip, New York